**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

JAMES J. MULHOLLAND and ANNA
MULHOLLAND,

       Plaintiffs,

v.

UFCW LOCAL 1776 PARTICIPATING
EMPLOYERS HEALTH AND WELFARE
FUND,

       Defendant.

CIVIL NO. 06-304(NLH)

**OPINION**

**APPEARANCES:**

Jeffrey S. Craig, Esquire
Christine S. Franchi, Esquire
KELLEY, WARDELL, CRAIG, ANNIN & BAXTER, LLP
41 Grove Street
Haddonfield, NJ 08033

      Attorneys for Plaintiffs

Brett I. Last, Esquire
O'BRIEN, BELLAND & BUSHINSKY, LLC
The Executive Plaza, Suite 101
2111 New Road
Northfield, NJ 08225

      Attorney for Defendant

**HILLMAN**, District Judge

    This matter comes before the Court on the motion of
Plaintiffs James J. Mulholland and Anna Mulholland for summary
judgment, and on the cross-motion for summary judgment of
Defendant UFCW Local 1776 Participating Employers Health and
Welfare Fund.  For the reasons expressed below, Plaintiffs'
motion will be denied, and Defendant's motion will granted in
part and denied in part.

## I.   BACKGROUND

Defendant is an employee health and welfare plan (the "Fund") established under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001.  Plaintiff James Mulholland is a participant of the Fund and Plaintiff Anna Mulholland is a covered dependant.  On February 19, 2001, Mrs. Mulholland suffered personal injuries as a result of a slip-and-fall accident.  Mrs. Mulholland received a total of $27,736.52 in medical and prescription benefits as a dependent covered by the Fund.

On February 4, 2003, the Mulhollands filed a personal injury suit in state court to recover damages for the injuries caused by the accident.  Subsequently, the Fund notified the Mulhollands that it was asserting a subrogation lien against any recovery obtained by them.  On April 11, 2005, the Mulhollands' attorney notified the Fund that the personal injury suit had been settled for $147,500.00.  The letter also indicated that the Mulhollands disputed the validity of the Fund's subrogation lien and, accordingly, would place the full settlement amount in escrow pending resolution of the matter.

The Mulhollands have moved for summary judgment, arguing that the Fund is not entitled to a suborgation lien against their personal injury settlement recovery.  The Fund has also moved for summary judgment, arguing that because the Mulhollands' medical

2

and prescription expenses related to the slip-and-fall accident were paid by the Fund, those expenses may be recouped from the Mulhollands' settlement recovery.

## II.  DISCUSSION

### A.  Summary Judgment Standard

Summary judgment is appropriate where the Court is satisfied that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(c).  If review of cross-motions for summary judgment reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts.  See Iberia Foods Corp. v. Romeo Jr., 150 F.3d 298, 302 (3d Cir. 1998) (citation omitted).

### B.  The Parties' Arguments

The Mulhollands contend that the Fund did not have the right to assert a subrogation lien on their recovery from a third party.  The Mulhollands first argue that nothing in the Trust Agreement, one of the Fund's primary plan documents, authorizes the Fund to assert a right of subrogation.  Second, even if there were such a right, the Mulhollands argue that the Fund could only recover benefits paid by the Fund--i.e., self-insured benefits--

3

and not benefits paid by another insurer.  The Mulhollands
contend that their benefits were paid by another insurer,
Independence Blue Cross/Pennsylvania Blue Shield  ("IBC"), and
are, thus, unrecoverable.  Finally, the Mulhollands argue that
because the lien was asserted in bad faith, they are entitled to
reimbursement of counsel fees and costs.

The Fund contests the Mulhollands' arguments, and argues
that the Fund is entitled to, and permitted to, be reimbursed for
the benefits it paid to them because the Fund paid those benefits
directly out of the Fund.  Even though IBC acts as an
administrator for the Fund and "pays" participants' claims, and
even though the Fund carries "stop-loss" insurance,[1] those
benefits paid to the Mulhollands were self-insured benefits,
recoverable under the terms of the plan.  The Fund is also
seeking attorneys' fees and costs.

C.   **Analysis**

The primary issue that must be decided is whether the
benefits paid to the Mulhollands were paid out of the Fund--if
they were not, then there is no need to address whether the Fund

_____

[1]"Stop loss" insurance policies insure employee benefits
plans, not plan participants, against catastrophic loss to the
plans where their payout for medical benefits exceed a certain
specific loss (for individual participants) or aggregate loss
(for all participants) in a given period.  See Bill Gray
Enterprises, Inc. Employee Health and Welfare Plan v. Gourley,
248 F.3d 206 (3d Cir. 2001).

may assert a subrogation lien to recover them.

### 1.   Whether the benefits were paid out of the Fund

The policies and procedures of the Fund are set forth in (1) the Agreement and Declaration of Trust ("Trust") and (2) the Summary Plan Description ("SPD").  The Trust authorizes a Board of Trustees to administer the Fund, and the SPD outlines the benefits to be provided, the rights and obligations of participants as to any benefits that are received, and the Funds' right to subrogation.

With respect to subrogation or reimbursement of costs and benefits, the SPD[2] states that a participant must notify the Fund whenever settlement payments related to a claim for benefits are received from a third party.  It provides:

> The Fund is entitled to 100% reimbursement of all costs and benefits, except as may be specifically agreed to by the Fund in writing, when you receive any payment from another party, if the Fund has paid or incurred, or will incur in the future, any such costs and/or benefits, . . . if the Fund has paid or incurred or will incur in the future, any such costs and/or benefits.

---

[2]Two different versions of the SPD have been attached to the parties' motions and related briefs.  The Mulhollands' brief in support of their motion for summary judgment (at Exhibit B) and the Fund's opposition to the Mulhollands' motion for summary judgment (at Exhibit 3) each include a 97-page version of the "Plan IV Summary Plan Description," which is dated "9/01."  The Fund's cross-motion for summary judgment includes (at Exhibit 1) a 58-page version of the "Plan IV Summary Plan Description," which is undated.  It is unclear why the Fund relies on two different versions of the SPD.  However, since both parties rely on it, the 97-page SPD dated "9/01" is the relevant SPD.  In any event, the discrepancies between the two SPDs are immaterial.

(Pl.'s Summ. J. Mot. Ex. B at 93.)[3]

With regard to the Fund's relationship with IBC, during the relevant period, the Fund was engaged in a National Account Administrative Services Agreement ("Services Agreement") with IBC.  The Services Agreement set forth the terms of the agreement under which IBC provided "cost-plus stop-loss administrative services" for the Fund, "which offers health care benefits to eligible individuals associated" with the Fund.  (Def.'s Mot. Summ. J. Ex. 4, at 1.)  Under this agreement, the Fund was liable to IBC for both claims expenses and retention charges.[4]  The agreement also provides, "In all events, the Sponsor [i.e., the Fund] shall be liable for the full amount of any benefits covered under the Benefit Program for the health claim that is the subject of the claim."  (Id. at 18.)  The agreement, however,

---

[3]The 58-page SPD provides,

The Fund has the right of reimbursement when you file any claim for benefits where the events that caused the claim are or may be the fault of, or may be payable by, any other party.  In these cases, you must sign an agreement to reimburse the Plan before it will pay any claims.
The agreement states that you are legally obligated to notify the Fund if you receive payment from a third party, such as . . . a result of a lawsuit. . . . The Plan is entitled to reimbursement from any party if the Plan has paid benefits.

(Def.'s Summ. J. Mot. Ex. 1.)

[4]Claims expenses generally include hospital and professional services.  The retention charge is a fee paid to IBC, based on the number of plan participants, for administering the benefits plan.  (Def.'s Summ. J. Mot. at Ex. 3.)

does not delineate what types of claims it applies to--e.g.,
medical treatment, prescription drugs, vision, etc.--but rather
generally states that it relates to the Fund's welfare plan.

The Mulhollands argue that the benefits were paid by IBC,
and not by the Fund, and as such, they are not reimbursable.  The
Mulhollands also argue that IBC's administrative costs are also
not reimbursable.  The Fund contends that the benefits were paid
by the Fund, and IBC simply acted as an administrator and
provided stop-loss insurance.  Because the Mulhollands' benefits
were paid by the Fund, and stop-loss insurance does not convert
the Fund into an insurer, the Fund argues that they are able to
seek reimbursement.

In Bill Gray Enterprises, Inc. Employee Health and Welfare
Plan v. Gourley, 248 F.3d 206 (3d Cir. 2001), our Court of
Appeals explained the relationship between a self-funded employee
benefit plan, its administrator, and the purpose and effect of
stop-loss insurance.  In Bill Gray, a self-funded employee
benefit plan sought reimbursement of benefits it paid to its
participant.  Id. at 209.  Through a subrogation and
reimbursement clause in the plan document, the plan retained
rights of subrogation and reimbursement against all plan
participants and third parties for medical benefits paid by the
plan.  Id.  The plan also purchased stop-loss insurance from an
insurance company to cover benefit payments exceeding $40,000.

Id.  It also engaged an outside administrator to process its claims.  Id. at 211.  The plan participant argued that the plan was precluded from seeking reimbursement--pursuant to a state statute prohibiting such reimbursement--because it was not a self-funded plan, and thus not subject to ERISA but rather state law.  Id.

The court held that a self-funded employee benefit plan does not become an insurer because it has purchased stop-loss insurance.  Id. at 214.  It explained that "[e]mployee benefit plans that purchase stop-loss insurance are not insuring plan participants, but insuring the plan itself in the event a catastrophic medical event requires the plan to pay out large sums to an individual participant."  Id.  The court admonished, however, that

> we recognize that a self-funded ERISA plan may purchase such a large amount of stop-loss insurance that it appears as if the plan is no longer operating as a self-funded employee benefit plan but rather effectively operating as an insurance company. In this instance the purchase of large amounts of stop-loss insurance may be evidence that the plan is attempting to retain the financial security provided by insurance coverage while at the same time reap the benefits of ERISA preemption, including the avoidance of state laws regulating reimbursement.

Id.  The court held that because there was no evidence that the Bill Gray Plan purchased an excessive amount of stop-loss insurance, it did not reach the issue of whether the purchase of

large amounts of stop-loss insurance effectively makes a self-funded ERISA plan an insurance company for ERISA preemption purposes.  Id.

Here, the Fund argues that the relationship between the Fund and IBC is the same as the plan's relationship with the claims processor and the insurance company in Bill Gray.  The Fund contends that its purchase of stop-loss insurance does not convert it into an insurer.  According to the Fund, it pays IBC a total cost of claims processed by IBC in a given month, plus retention, which is a monthly charge per participant paid to IBC for its services rendered, unless the total exceeds the stop-loss attachment.

The Mulhollands contest the Fund's position.  They argue that the Fund has provided no evidence, other than its unsupported statements, that the benefits paid to the Mulhollands were paid out of the Fund.  Additionally, the Mulhollands have provided correspondence from IBC's general counsel to the Mulhollands that states, "For your information, QCC [Insurance Company, IBC's wholly owned subsidiary] considers the Fund to be a fully insured plan--not a self-funded plan."  (Pl.'s Summ. J. Mot. Ex. D.)

The Fund is correct that simply because it has stop-loss insurance it is not automatically considered to be an insurer, and the Mulhollands have not provided any evidence that the Fund

9

purchased an excessive amount of stop-loss insurance.  Thus, the
fact that the Fund had stop-loss insurance during the relevant
time period does not mean it did not pay benefits to the
Mulhollands, and it does not mean that it is subject to state
law.

The Bill Gray case cannot, however, address the question
whether the Fund actually paid the Mulhollands' benefits out of
its own funds.  To support its position, the Fund has supplied an
affidavit of Regina C. Reardon, Esq., the Fund Administrator
since September 17, 1997.  (Def.'s Summ. J. Mot. Ex. 2.)  Reardon
states, "As a result of the February 19, 2001 accident,
Plaintiffs incurred costs for medical treatment and prescription
drugs which were paid as covered benefits by the Fund.  The Fund
paid medical and prescription benefits along with associated
administrative costs in the amount of $27,736.52."  (Id. ¶ 11.)
The affidavit, however, does not attach any records evidencing
that the payment for Mrs. Mulhollands' medical bills came out of
the Fund.

To further support its position, the Fund has supplied
several copies of "Explanation of Benefits" statements from IBC,
and these documents state, "These health benefits are entirely
funded by the employer.  IBC provides administrative and claims
payment services only."  (Def.'s Summ. J. Mot. Ex. 6.)  These
documents, however, do not identify the member's name, the ID

10

number, claim number, provider number, or group number.  There is
nothing linking these documents to the Mulhollands, and there is
nothing evidencing that these documents were even created for a
participant in the employee benefits plan at issue here.  The
only identifier on these IBC documents is one explanation of
benefits statement addressed to "Regina C. Reardon."[5]

The Fund also relies on a Subrogation Acknowledgment and
Reimbursement Agreement signed by the Mulhollands.  The
Acknowledgment reads in relevant part:

> [A]s a condition precedent to the payment of benefits to the
> undersigned or his/her assignee or on his/her behalf by the
> Fund, the undersigned hereby acknowledges and agrees that
> the Fund shall have the right of subrogation and/or
> reimbursement to the extent of such benefits hereafter or
> previously paid as a consequence of said injuries in the
> event of the undersigned's recovery against any
> party/parties either by way of or settlement, verdict or
> otherwise . . . the undersigned hereby agrees to make a
> refund to the Fund or reimburse the Fund the total amount
> paid by it in the event the undersigned's net recovery is
> equal to or greater than the total amount being paid to the
> undersigned or to his/her assignee or on his/her behalf,
> otherwise said refund and/or reimbursement shall be limited
> to the amount of undersigned's recovery.

(Def's Summ. J. Mot. Ex. 2.)  This document, although possibly
relevant to the issue of the Fund's ability to assert a lien, is
not dispositive of the issue of whether the Fund actually paid
the benefits to the Mulhollands.  Indeed, the acknowledgment

---

[5]It is unclear on its face whether IBC sent Reardon that
particular document in her capacity as Fund administrator, or
whether this explanation of benefits statement is for a medical
service Reardon herself obtained.

states that the Fund is only entitled to reimbursement for "the total amount paid by it." Finally, the Fund relies on the Services Agreement with IBC, but, as mentioned above, that agreement does not delineate whether it applies to medical treatment, prescription drugs, vision, etc., but rather the entire welfare plan.

Conversely, to support their position that the benefits paid to the Mulhollands were not paid out of the Fund, the Mulhollands rely on the fact that the Fund has not presented any evidence to demonstrate that the Fund paid their medical bills. The Mulhollands also rely on the statement from IBC's general counsel to the Mulhollands' attorney that "QCC [Insurance Company, IBC's wholly owned subsidiary] considers the Fund to be a fully insured plan--not a self-funded plan." (Pl.'s Summ. J. Mot. Ex. D.)

Additionally, the Mulhollands refer to the language in the SPD, which states that "the Fund provides health insurance benefits for hospitalization, doctor visits, and certain other medical care . . . for you and your eligible dependents through the Personal Choice Program . . . administered by QCC Ins. Co., a subsidiary of Independence Blue Cross." (Id. Ex. A, at 3, 17.) The SPD continues, "The Plan pays directly for, or self-insurers other benefits including dental, vision, prescription drugs, disability, mental health treatment, medical emergency, allergy, child care, physical fitness and education. . . . The Board has

contracted with outside providers to process the claims for certain of these benefits, including prescription drugs, mental health treatment, medical emergency, allergy, child care, and vision. . . ." (Id. at 4.)  The Mulhollands interpret this language as evidence that the medical benefits are "insured" and the other listed benefits are self-insured.

In its Reply brief, the Fund provides additional evidence to support its position that it is an entirely self-funded plan. It supplies a second affidavit of Regina Reardon, which attaches bills from IBC to the Fund for May 2006, as well as checks paid by the Fund to IBC in May 2006. (Def.'s Reply Ex. 1.)  Reardon explains that IBC charges the Fund for all of the charges IBC has incurred for health care services. (Id. ¶ 6.)  The Fund is responsible for paying the total amount of claims, minus any savings, plus the fee IBC charges for its administrative services. (Id. ¶¶ 7-10.)  Based on this, Reardon states that "the Fund pays medical claims, not only on behalf of Plaintiffs, but on behalf of all participants," with the only exception occurring "in those months in which the Fund's stop loss protection applies." (Id. ¶ 19.)

Cross-motions for summary judgment, like any summary judgment motion, may only be resolved if there is no genuine issue of material fact. See Iberia Foods Corp. v. Romeo Jr., 150 F.3d 298, 302 (3d Cir. 1998) (citation omitted).  An issue is

13

"genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit. Id. In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in his favor." Marino v. Industrial Crating Co., 358 F.3d 241, 247 (3d Cir. 2004)(quoting Anderson, 477 U.S. at 255).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Id. Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Anderson, 477 U.S. at 256-57. A party opposing summary judgment must do more than just rest upon mere allegations, general denials, or vague statements. Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001).

The parties' cross-motions for summary judgment must be

14

considered separately.  Addressing the Fund's motion first, prior
to filing its reply brief, the Fund had failed to meet its
burden.  Its only evidence to support its position that the
Mulholland medical bills were paid out of the Fund was (1)
subject to credibility determination (Reardon's statement in her
affidavit), (2) subject to challenge (anonymous explanation of
benefits statements from IBC), and (3) not dispositive (the
acknowledgment form signed by the Mulhollands, the Services
Agreement with IBC).  The Fund's reliance on this evidence and
its unsupported statements also were insufficient to demonstrate
the absence of a genuine issue of material fact as to who paid
the Mulhollands' medical bills.

The Fund, however, has provided additional evidence in its
reply brief.[6]  It supplied an IBC bill and Fund payment check to
IBC for May 2006.  It also supplied a second affidavit of the
plan administrator, who states again that the medical benefits
for all plan participants, including the Mulhollands, are paid by
the Fund, and not through an insurance policy provided by IBC.
This evidence, although not as precise as statements from 2001

---

[6]The Court has discretion to decline to consider new facts
or arguments raised in a reply.  See Laborers' Int'l Union v.
Foster Wheeler Corp., 26 F.3d 375, 398 (3d Cir. 1994).  Because
the facts and arguments raised in the Fund's reply are material
to the resolution of this case, and because the Mulhollands will
have a chance to respond to this new information, the Court will
consider it.

that specifically show that the Fund paid a certain amount for
Mrs. Mulholland's medical bills, demonstrates that the Fund does
pay plan participants' health care benefits.  What the evidence
does not show, however, is whether the claims paid were for all
benefits, including medical, or only for the "other benefits" as
defined in the SPD.

The Fund argues that this distinction, which is argued by
the Mulhollands, is illusory.  The Fund argues that even though
the SPD uses the term "health insurance benefits," the SPD makes
it clear that it is the Fund that is providing those benefits.
(Def.'s Reply at 7.)  Additionally, the Fund states that
"participants, who are not familiar with the ASA [agreement with
IBC], it may appear as though IBC is providing their coverage.
However, the reality is, that the Fund must reimburse IBC for the
claims that it pays pursuant to the terms of the ASA."  (Id.)
The Fund further states that its relationship with IBC is exactly
what the contract between them is titled--IBC simply provides
administrative services, and not insurance for medical care, and
that all the benefits it provides to its participants are paid by
it, and not by IBC.

Determining whether this evidence is sufficient to meet the
Fund's burden of proving that there is an absence of genuine fact
as to whether the Fund paid for the Mulhollands' medical bills,
necessarily implicates the determination of whether the

16

Mulhollands have identifed specific facts and affirmative evidence that contradict those offered by the Fund, which also serves to determine whether they have met their own burden for summary judgment.

Prior to the Fund submitting additional evidence in its reply, the strongest proof to support the Mulhollands' position was the fact that the Fund had not provided any specific evidence that the medical bills were paid out of the Fund.  Indeed, a moving party can meet its burden of showing the absence of genuine fact by "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 323.  The supplemental affidavit of the plan administrator and the attached bills, however, weakens the Mulhollands' strongest argument.  The Mulhollands also support their position with the SPD language, which they claim distinguishes between medical health benefits and self-insured prescription, vision, etc. benefits, as well as the representation from IBC that the employee benefits plan is not a self-funded plan.

At this point, however, neither party has sustained its burden of proof.  Even though the Fund has submitted evidence that it pays IBC large amounts of money for its participants' claims, that evidence only relates to May 2006, and not to 2001 when Mrs. Mulholland was injured and received treatment.

Further, that evidence does not demonstrate why type of claims it
pays.  Even though the Fund takes issue with the Mulhollands'
interpretation of the SPD, neither the Reardon affidavit nor the
bills and checks assuage that misinterpretation.  Moreover, the
Fund does not address IBC's statement that the Fund is not self-
insured, other than to deny it.  This issue alone--that IBC,
which purportedly acts only as an administrator and stop-loss
provider for the Fund, categorizes that Fund as "insured"--raises
an issue of material fact, and the Fund must do more to discredit
that fact than to "strenuously object" to it.  (See Def.'s Reply
at 4.)

     The Court recognizes that discovery has closed in this case,
and because both parties have submitted motions for summary
judgment, each side purportedly has presented its best case.  The
Court also recognizes that this case is amenable for summary
resolution, and these outstanding issues may be readily
determined if the parties had one more opportunity to address
them.  Consequently, the Court will deny without prejudice both
parties' motions, and will direct each side to refile its motion
addressing, and limiting it to, the precise issues identified
above.

     This holding, however, only applies to the medical bills
incurred by Mrs. Mulholland.  The Mulhollands concede that, based
on the language in the SPD, the "Local 1776 Fund self-insures

18

prescription drug benefits."  (Pl.'s Summ. J. Mot. at 11 n.3.)
Even though the Fund has not submitted any proof with regard to
whether it actually paid Mrs. Mulholland's prescription benefits
out of the Fund, this concession, in combination with the plan
language of the SPD, evidences an absence of material fact as to
this issue.  Consequently, it still must be determined whether
the Fund has the right to be reimbursed for the benefits it paid.

### 2.   Whether the Fund authorizes the right to subrogation

The Mulhollands argue that because the Trust Agreement
requires that any payment out of the plan's funds be authorized
by a unanimous vote of the Trustees, and because the Fund has not
provided any evidence that the Trustees unanimously voted to
allow the right of subrogation, then the Fund is not permitted to
recover the benefits paid to the Mulhollands.

The Fund contends that the right of reimbursement is clearly
delineated in the SPD, and the language of the SPD was
unanimously approved by the Fund's Board of Trustees in accord
with their powers and fiduciary obligations to the Fund.

The Mulhollands' narrow reading of the Trust Agreement does
not comport with the fiduciary duties of the Trustees.  Trustees
are required by ERISA to discharge their duties with respect to a
plan solely in the interest of the participants and
beneficiaries, for the exclusive purpose of providing benefits to

19

participants and their beneficiaries, and for defraying
reasonable expenses of administering the plan.  <u>Central States,
Southeast and Southwest Areas Pension Fund v. Central Transport,
Inc.</u>, 472 U.S. 559, 570 (1985) (citing 29 U.S.C. §§
1104(a)(1)(A), 1103(c)(1)).  The Trust Agreement explicitly
incorporates these ERISA provisions.  (Pl.'s Ex. A; Def.'s Ex. 2,
Section 3.6.)  Additionally, the Trust Agreement provides that
the Trustees are empowered to "do all acts, whether or not
expressly authorized herein, which the Trustees may deem
necessary or proper for the protection of the property held
hereunder."  (<u>Id.</u> at Section 5.10(e).)  Further, the Trustees
"shall have full power to construe the provisions of this
Agreement, the terms used herein, and the by-laws and regulations
issued hereunder.  Any such determination and any such
construction adopted by the Trustees in good faith shall be
binding upon all of the parties hereto and the beneficiaries
hereof."  (<u>Id.</u> at Section 5.18.)

     The provision in the Trust Agreement cited by the
Mulhollands is in the section titled "Use of Fund," which
delineates the Trustees' authority to pay expenses, collect
contributions, pay benefits according to the SPD, establish a
reserve, and "by unanimous vote, provide for a plan of payment of
authorized benefits out of the Trust Fund itself; provided,
however, that such payments can be legally made and that same are

in full compliance with all statutory and legal requirements."
(Id. at Section 5.2.)  A plain reading of this provision does not
support the Mulhollands' contention that the right to seek
reimbursement must be evidenced by a specific vote.  Rather, the
provision simply provides that the implementation of any benefits
plan that would use money from the Fund must be approved by
unanimous vote, which makes sense considering the
responsibilities of the Trustees, as required by ERISA and set
forth in the Trust Agreement, to protect the Fund and its
participants and beneficiaries.  Because the Mulhollands were
part of an existing plan which provided them benefits, it can be
presumed that their benefits plan, as described in the SPD, had
already been approved by a unanimous vote.

     Additionally, a plain reading of this provision actually
contradicts the Mulhollands' other argument that their benefits
were not paid "out of the Trust Fund."  By arguing that
reimbursement of any payments made "out of the Trust Fund" must
have been pre-approved, they are tacitly conceding that their
benefits were paid by the Fund, rather than by a separate
insurer.  Otherwise, if their benefits had been paid by a
separate insurer, there would be no need for a unanimous vote
under their interpretation of Section 5.2(e).

     The requirements of ERISA and the terms of the Trust
Agreement mandate that the Trustees act in the best interest of

the Fund and its participants and beneficiaries, and the Trust
Agreement gives the Trustees authority to do what is necessary
and proper in order to fulfill their fiduciary duties.  As
discussed above, the SPD allows the Fund to be reimbursed for
benefits it paid out of the Fund, which comports with the
Trustees' fiduciary duties.  Further, the Trustees have full
power to interpret the terms of the benefits plan, and only a
finding that they acted arbitrarily and capriciously would serve
to disrupt their interpretation.  See Abnathya v. Hoffman-
LaRoche, Inc., 2 F.3d 40, 45 (3d Cir. 1993)(stating that when an
ERISA plan affords the administrator discretionary authority, a
district court's grant of summary judgment is made under an
arbitrary and capricious standard, and under this standard of
review, an administrator's decision must be affirmed unless it
was "without reason, unsupported by substantial evidence or
erroneous as a matter of law").  Because the Mulhollands have not
provided any evidence that the Trustees's interpretation of the
Trust Agreement and SPD was made in bad faith, the Fund's right
to seek reimbursement of self-insured benefits stands.

     The right of the Fund to seek reimbursement for the benefits
it paid is also supported by the acknowledgment signed by the
Mulhollands.  The Mulhollands argue that the waiver is
unenforceable because there is no proof that they "knew of their
legal rights to oppose Defendant's unjustified subrogation claim

or that they deliberately intended to relinquish said rights."
(Pl.'s Reply at 6.)  Even though the general principle of waiver
"involves the intentional relinquishment of a known right, and
thus it must be shown that the party charged with the waiver knew
of his or her legal rights and deliberately intended to
relinquish them," Shebar v. Sanyo Business Systems Corp., 544
A.2d 377, 384 (N.J. 1988) (citation omitted), here, the Fund's
right of subrogation is independent of whether the Mulhollands
signed an acknowledgment of that right.  The acknowledgment,
however, serves to evidence that the Mulhollands were informed of
that right.

    Thus, the Fund is entitled to summary judgment on its claim
for reimbursement of the amount it paid in prescription benefits
for Mrs. Mulholland.

### 3.    Whether either party is entitled to attorneys fees and costs

    Both parties argue that they are entitled to attorneys' fees
and costs pursuant to ERISA section 502(g), which provides,

> (1) In any action under this subchapter (other than an
> action described in paragraph (2)) by a participant,
> beneficiary, or fiduciary, the court in its discretion
> may allow a reasonable attorney's fee and costs of
> action to either party.

29 U.S.C. § 1132(g).

    The Court will reserve decision on this issue and will

address it in consideration of the parties' renewed summary
judgment motions.

**III. CONCLUSION**

For the reasons expressed above, the parties' cross-motions
for summary judgment as to whether the Fund is entitled to be
reimbursed for medical benefits Mrs. Mulholland received are
denied without prejudice.  The parties are directed, as detailed
in the accompanying Order, to renew their motions on this precise
issue.  Because the parties did not specifically address the
Fund's right to recover its administrative costs, the parties are
directed to address this issue in their renewed motions as well.
Additionally, the parties may also revisit their request for
attorneys fees and costs in response to this supplemental
briefing.  The Fund's motion for summary judgment is granted as
to its right to be reimbursed for the prescription benefits paid
to Mrs. Mulholland.


Dated: September 25, 2007           s/ Noel L. Hillman

At Camden, New Jersey               NOEL L. HILLMAN, U.S.D.J.